CHARLES CUTRER
DAVIS VS. UNION PACIFIC RAILROAD COMPANY

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

ROBERT DAVIS            )
    PLAINTIFF,          )
                        )
VS.                     )NO. 4-07-CV-00521-BSM
                        )
UNION PACIFIC RAILROAD  )
COMPANY                 )
    DEFENDANT.          )

ORAL DEPOSITION OF

CHARLES CUTRER

JANUARY 26, 2009

KELLY D. HILL

7010 RICHWOOD ROAD

LITTLE ROCK, ARKANSAS 72207

(501) 353-2220

CHARLES CUTRER
DAVIS VS. UNION PACIFIC RAILROAD COMPANY

Page 2

1    ANSWERS AND DEPOSITION OF CHARLES CUTRER, a
2  witness produced at the request of the Plaintiff,
3  was taken by Notice of Deposition, and taken in
4  the above-styled and numbered cause on the 26th
5  day of January, 2009, 2:00 p.m., before Kelly
6  Hill, a Certified Court Reporter, taken at the
7  law offices of Friday, Eldredge & Clark, 400 West
8  Capitol Avenue, Suite 2200, Little Rock,
9  Arkansas, 72201, in accordance with the Federal
10 Rules of Civil Procedure.

Page 4

S T I P U L A T I O N S

3    The attorneys for all parties present
4  stipulate and agree as follows:

Objections:
   Reserve all objections, except as to the form
of the questions and the nonresponsiveness of the
answers, until the time of trial, which
objections are waived if not made at the taking
of the deposition.

Signature:
   Read & Sign.

Page 3

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFF:

   MR. ANDREW S. WILLIAMS    (via telephone)
   SCHLICHTER, BOGARD & DENTON
   100 S. 4TH STREET, SUITE 900
   ST. LOUIS, MISSOURI 63102

ON BEHALF OF DEFENDANT:

   MR. SCOTT H. TUCKER
   FRIDAY, ELDREDGE & CLARK
   400 WEST CAPITOL AVENUE, SUITE 2000
   LITTLE ROCK, ARKANSAS 72201

ALSO PRESENT:  BRIAN GRIFFITH

Page 5

I N D E X

STYLE AND NUMBER . . . . . . . . . . . . . 1
APPEARANCES. . . . . . . . . . . . . . . . 3
STIPULATIONS . . . . . . . . . . . . . . . 4
DEPOSITION EXHIBIT INDEX . . . . . . . . . 5

WITNESS:  CHARLES CUTRER
   Examination by Mr. Williams. . . . . . . 6
   Deposition Concluded . . . . . . . . . 35
   Errata Sheet . . . . . . . . . . . . . 36
COURT REPORTER'S CERTIFICATE . . . . . . . 37

         DEPOSITION EXHIBITS
No. 1  About AREMA              Page  6
No. 2  AREMA Committee 1        Page  6
       Roadway & Ballast

No. 3  AREMA Chapter 1          Page  6
       Roadway & Ballast
No. 4  U.P. & Burlington Northern   Page  6
       Santa Fe Railroads' Specifications for
       Main, Branch and Yard Track Ballast
No. 5  Ballast Gradation Table  Page  6
No. 6  Photos of Track          Page  6
No. 7  Photos of Rock           Page  6

Page 6

1      P R O C E E D I N G S
2         CHARLES CUTRER,
3   having been first duly cautioned and sworn to
4   testify the truth, the whole truth and nothing
5   but the truth, testified on his oath as follows:
6         (Deposition Exhibit Nos. 1 through
7   7 were marked.)
8         EXAMINATION
9   BY MR. WILLIAMS:
10  Q. Hi. Could you please state your full name
11  for the record?
12  A. Charles Lee Cutrer.
13  Q. Mr. Cutrer, my name is Andy Williams. I'm an
14  attorney. I've been retained by Robert Davis in
15  regard to some allegations he has made stating
16  he sustained an injury as a result of an incident
17  that occurred while he was working for Union
18  Pacific. I'm here today to ask you some
19  questions in that regard, okay?
20  A. Okay.
21  Q. Is that your understanding of what's going to
22  occur today?
23  A. Yes.
24  Q. And did you receive notice that you were
25  going to have your deposition taken?

Page 7

1   A. Yes.
2   Q. Have you ever had your deposition taken
3   before?
4   A. Yes.
5   Q. I'm going to go over some of my ground rules
6   that may be different than from what some other
7   attorneys may have said to you in the past.
8      The first and foremost is, I'm going to ask
9   you a series of questions. If at any time you
10  don't understand my question, would you do me a
11  favor and let me know?
12  A. All right.
13  Q. If you don't say anything, I'm going to
14  assume that you gave me a full, fair and honest
15  answer, okay?
16  A. Okay.
17  Q. In addition, you need to make sure that I
18  complete my question before you begin to answer,
19  that ensures that you understand my question, and
20  it also gives the court reporter an opportunity
21  to get us both down clearly, okay?
22  A. Okay.
23  Q. Also, we need to make sure that any of your
24  responses are verbal, yeses or noes. Uh-huh,
25  huh-uh, shakes, nods, make for a horrible record,

Page 8

1   and I can't see them, okay?
2   A. I understand.
3   Q. Okay. Did you review any documents in
4   preparation for today's deposition?
5   A. Some exhibits.
6   Q. Pardon me?
7   A. No documents, no, sir.
8   Q. Okay. Well, you said exhibits. There are
9   certain exhibits I forwarded to Mr. Tucker, the
10  attorney for Union Pacific, prior to the
11  deposition. Have you reviewed those?
12  A. Yes.
13  Q. Okay. If you could, tell me, sir, what is
14  your occupation?
15  A. I'm Manager of Track Maintenance.
16  Q. And what is the Manager of Track Maintenance
17  responsible for?
18  A. Supervise the safety of the employees and the
19  track.
20  Q. Do you have a certain geographic area of
21  track that you're responsible for?
22  A. North Little Rock area.
23  Q. Now, I've heard the title sometimes used as
24  roadmaster. Is your job the same as a
25  roadmaster, different, or what exactly -- how

Page 9

1   would you compare it?
2   A. It's the same.
3   Q. Okay. And how long have you been the Manager
4   of Track Maintenance in the North Little Rock
5   area?
6   A. About five years.
7   Q. Does that include the North Little Rock yard?
8   A. Yes.
9   Q. Does it -- that job entail other trackage or
10  other yards outside of the North Little Rock
11  yard?
12  A. Yes.
13  Q. And what areas outside the North Little Rock
14  yard?
15  A. I have the mainline from Alexander, Arkansas
16  to Jacksonville, Arkansas.
17  Q. Any other yards?
18  A. I have a yard, Biddle yard.
19  Q. Anything other than Biddle?
20  A. No, sir. That's about it.
21  Q. Okay. Prior to your stint in North Little
22  Rock as the Manager of Track Maintenance, how
23  were you employed?
24  A. I was Manager of Track Maintenance in Fort
25  Worth, Texas.

3 (Pages 6 to 9)

CHARLES CUTRER
DAVIS VS. UNION PACIFIC RAILROAD COMPANY

Page 10

1  Q. And your duties in Fort Worth, Texas, what
2  geographic area did you cover?
3  A. The Fort Worth yard, which at that time was
4  called Centennial yard, the mainline from
5  Arlington, Texas to Fort Worth, and a mainline
6  from Fort Worth, Texas to Chico, Texas, and a
7  mainline from Fort Worth, Texas to Roanoke,
8  Texas.
9  Q. And, you know, barring some slight changing
10 and maybe geographical responsibility, how long
11 were you the Manager of Track Maintenance for
12 that Fort Worth area?
13 A. Four years.
14 Q. And prior to Fort Worth what were you doing?
15 A. I was a track supervisor.
16 Q. What are the duties of a track supervisor?
17 A. Ensure the safety of the employees, and then
18 we went around and did road crossings, installed
19 ties, project work.
20 Q. Did you have a crew that you're responsible
21 for?
22 A. Yes, I did.
23 Q. How many people were on that?
24 A. 22.
25 Q. And do you recall -- I assume going from

Page 11

1  track supervisor to Manager of Track Maintenance
2  is a promotion?
3  A. Yes.
4  Q. Do you recall the date that you received that
5  promotion?
6  A. I'm not sure. It was the year of 2000. I'm
7  not sure of the date.
8  Q. And I apologize, where were you a track
9  supervisor, what geographic location?
10 A. Fort Worth/Dallas area.
11 Q. And how long -- for what period of time
12 number of years were you a track supervisor in
13 the Fort Worth/Dallas area?
14 A. Six years.
15 Q. Prior to you being a track supervisor in Fort
16 Worth/Dallas what was your position?
17 A. Track inspector.
18 Q. And what location were you track inspector?
19 A. Waco to Fort Worth, the Fort Worth/Dallas
20 area.
21 Q. And what number of years were you a track
22 inspector?
23 A. 14.
24 Q. And all the 14 of those years, was that in
25 the same location, the Waco, Fort Worth/Dallas

Page 12

1  area?
2  A. Yes.
3  Q. So I'd be correct in assuming you came to
4  North Little Rock sometime about 2004, 2003,
5  somewhere in there?
6  A. End of 2004.
7  Q. Now, the Manager of Track Maintenance, is
8  part of your responsibility selecting the grade
9  of ballast to put in certain locations?
10         MR. TUCKER: Object to the form of
11 the question. The witness can answer it. Go
12 ahead.
13 A. Would you say that again, please?
14 Q. Sure. As Manager of Track Maintenance, is
15 part of your responsibility determining what
16 grade of ballast to place in certain locations?
17         MR. TUCKER: Same objection. You
18 can answer it.
19 A. No.
20 Q. Okay. Well, do you know -- can you tell me
21 who makes that determination?
22 A. It's a standard coming from Omaha. I don't
23 make a decision like that.
24 Q. Okay. If you could, if you look at Exhibit 1
25 that I've had marked for deposition, and I'll

Page 13

1  tell you that this is a copy of a web page for a
2  group called A-R-E-M-A. Are you familiar with
3  A-R-E-M-A, or sometimes called AREMA?
4  A. Yes.
5  Q. Are you a member of AREMA?
6  A. Yes.
7  Q. And how long have you been a member of AREMA?
8  A. Maybe three years. I'm not positive.
9  Q. Okay. And how did you -- how is it you
10 became to become a member of AREMA?
11 A. Just signed up for it.
12 Q. Okay. Well, did someone suggest that you
13 become a member, or is it something you were
14 aware of and finally decided, hey, I need to sign
15 up, or how did you go about making that
16 determination?
17 A. A previous boss of mine suggested I join.
18 Q. Do you recall that boss' name?
19 A. Kevin Hicks.
20 Q. And was he a Union Pacific employee?
21 A. Yes.
22 Q. Do you know if he was a member of AREMA?
23 A. Yes, he was.
24 Q. Do you know whether or not there are other
25 people with track maintenance responsibility on

Page 14

1  the Union Pacific that are members of AREMA?
2  A. I don't know for sure.
3  Q. If you look at Exhibit No. 2, I'll tell you
4  that this is a web page -- or purports to be a
5  web page of AREMA talking about a certain
6  committee in charge of roadway and ballast. It
7  shows the Vice Chair of this particular committee
8  is a Perly Schoville. He's an engineer for Union
9  Pacific Railroad. Do you know Mr. Schoville?
10 A. No, I do not.
11 Q. Okay. Do you know what the job of assistant
12 engineer entails?
13 A. Not really.
14 Q. If you go to Exhibit No. 3, I'll purport to
15 you that this is a printout of an AREMA web page.
16 It talks about the Manual for Railway
17 Engineering, Volume 1, Chapter 1, Roadway &
18 Ballast. Have you ever seen that document, the
19 Manual for Railway Engineering, Volume 1?
20 A. No, I have not.
21 Q. Would you have access to that particular
22 manual as a member of AREMA?
23 A. I'm not sure.
24 Q. If you could, then go to Exhibit No. 4, which
25 is the Union Pacific and Burlington Northern

Page 15

1  Santa Fe Railroads' Specifications for Main,
2  Branch and Yard Track Ballast. Do you see that?
3  A. Yes, sir.
4  Q. Have you ever seen this document before?
5  A. I don't think so.
6  Q. If you go to the very last page of that
7  document, Page 8, the title is Union Pacific &
8  Burlington Northern Santa Fe Railroad Companies,
9  and it says Table No. 3, Ballast Gradations. Do
10 you see that?
11 A. Yes.
12 Q. Have you ever seen this table before?
13 A. No.
14 Q. There is a note underneath this particular
15 table, and it says, Gradation designation Class 1
16 is main track ballast material. Gradation
17 designation Class 2 is secondary main, branch and
18 yard ballast. Do you see that?
19 A. Yes.
20 Q. Okay. And is that your understanding of what
21 Union Pacific recommends or requires for ballast
22 gradation?
23 A. Recommendation, yes, sir.
24 Q. And you said earlier that you don't make the
25 determination as to what type of ballast goes in

Page 16

1  what location, correct?
2  A. That's correct.
3  Q. And that comes from Omaha is what you told
4  me, correct?
5  A. That's correct.
6  Q. It is the table and the information -- Table
7  No. 3 and the information under Table No. 3 your
8  understanding of what type of ballast is supposed
9  to go in what location according to Union Pacific
10 from Omaha?
11 A. Yes.
12 Q. If you go to Exhibit No. 5?
13       MR. TUCKER: Hold on just a second,
14 Counsel.
15       MR. WILLIAMS: Sure.
16       MR. TUCKER: We've got some type of
17 noise or beeping.
18         (Off the record.)
19         (Back on the record.)
20 Q. (By Mr. Williams) Going to Exhibit No. 5 in
21 front of you is another table entitled Ballast
22 Gradation Table for Union Pacific Railroad. Do
23 you see that?
24 A. Yes.
25 Q. Have you ever seen this Ballast Gradation

Page 17

1  Table before?
2  A. Yes, I have.
3  Q. Okay. Is this something you use to determine
4  what grade of ballast goes in certain locations?
5  A. No, sir.
6  Q. Okay. What do you use this particular table
7  for?
8  A. I don't use this particular table.
9  Q. Okay. Well, you say -- just so I
10 understand -- you say you've seen it before,
11 correct?
12 A. Yes, sir.
13 Q. And I guess my next question then would be,
14 in what capacity or when did you see this table
15 in the past?
16 A. I don't have a date when I saw it.
17 Q. Okay. Do you know in what context, in other
18 words, why you would have been reviewing this
19 table?
20 A. It's in our book of standards.
21 Q. Okay. And is that book of standards
22 something you use to determine what type of grade
23 ballast goes in certain locations?
24 A. No, sir.
25 Q. Well, what do you use the book of standards

Page 18

1  for?
2  A. For other standards like switches or anything
3  like that.
4  Q. Okay. What tool or what document is it that
5  you use to determine what grade of ballast goes
6  into certain locations?
7  A. It's whatever is it out on the track already.
8  Q. So you don't make any determination, you just
9  order and place what's already in place?
10 A. Yes.
11 Q. Or I should say the grade in place, correct?
12 A. That's correct.
13 Q. Okay. When it comes time where it comes to
14 your attention that ballast may be needed in a
15 certain area, is there a certain provider you use
16 to order that ballast from?
17 A. I put in an order and they get it -- I don't
18 know what vendor they get it from. I just ask
19 for ballast and they'll send it.
20 Q. And to whom do you place that order?
21 A. I do it on the internet.
22 Q. And I would imagine you place that order
23 internally to someone at Union Pacific or
24 someplace else?
25 A. Internally to Union Pacific.

Page 19

1  Q. Do you know what department you make that
2  request to?
3  A. No, sir, I don't.
4  Q. Do you send an e-mail?
5  A. We have a requisition system we requisition
6  it through.
7  Q. Okay. When the ballast that you have
8  requested arrives, do you have to send an invoice
9  for the ballast that is received?
10 A. No, sir.
11 Q. Do you know if anyone else does?
12 A. I don't know.
13 Q. Have you ever been present when ballast you
14 order arrived?
15 A. Yes.
16 Q. Did it arrive by train or by truck?
17 A. By train.
18 Q. And do you recall what -- whether there was
19 any markings on the side of the car that the
20 ballast came in or any identification from where
21 the ballast came?
22 A. No. They're U.P. ballast cars.
23 Q. Now, looking at Exhibit No. 5, there is on
24 the left-hand side a grid with some various
25 different areas with different shade in each

Page 20

1  area. Do you see that?
2  A. Yes.
3  Q. And underneath that is a legend that talks
4  about what each area of shading refers to. Do
5  you see that?
6  A. Yes.
7  Q. Okay. It says, Class 1 ballast for main
8  track (Old D). Do you see that?
9  A. Yes.
10 Q. Then it says Class 2, ballast for secondary
11 main, branch and yard track (Old C) Do you see
12 that as well?
13 A. Yes.
14 Q. Is that your understanding of ballast
15 requirements of Union Pacific in regard to
16 grade -- gradation?
17 A. Yes.
18 Q. If you could, describe to me in your words
19 what is Class 1 ballast?
20 A. Class 1 ballast is we call mainline ballast.
21 Q. And what are -- what is the general size of
22 mainline ballast?
23 A. It varies from two inches, two to three
24 inches, down to probably an inch-and-a-half.
25 Q. Okay. And can you tell me your words what

Page 21

1  Class 2 ballast is?
2  A. What they call yard ballast.
3  Q. And what size is yard ballast?
4  A. I'd say one-and-a-half inches down to
5  probably three-quarter of an inch.
6  Q. Now, next to the graph is a table. Do you
7  see that?
8  A. Yes.
9  Q. And it has on the left-hand side of that
10 table, the left most column, there's various
11 titles. AREMA Standard, and it says U.P. Ballast
12 Class, then it says Square Opening, and it has a
13 number of measurements. Do you see that?
14 A. Yes.
15 Q. Okay. And it appears that the AREMA standard
16 then corresponds with what that means to the
17 specific U.P. Class; would that be correct; in
18 other words, 4A for AREMA is U.P. Class 1?
19 A. I wouldn't know that.
20 Q. Okay. Well, it's got the next entry down
21 says Square Opening. Do you see that?
22 A. Yes.
23 Q. Do you know what that refers to?
24 A. Not really.
25 Q. If you go to Exhibit No. 6, which is a

Page 22

1  variety of pictures -- before I get to No. 6,
2  have you ever gone out and inspected the area or
3  seen the area where Mr. Davis alleges he was
4  injured?
5  A. I've been in the service track area, yes.
6  Q. Now, were you out there for the purpose of
7  looking into Mr. Davis' claim or were you out
8  there as other part of your duties?
9  A. Other part of my duties.
10 Q. Okay. But you have been around the service
11 track in the area that's depicted, correct?
12 A. Yes.
13 Q. And you're familiar with that area?
14 A. Yes.
15 Q. And if you could, by looking at these photos,
16 could you tell me what class of ballast is
17 generally depicted in these pictures as it
18 pertains to the ballast from the rail closest to
19 the pit until the actual edge of the pit?
20 A. Just looking at the photos, no.
21 Q. How would you go about determining what
22 ballast class that is?
23 A. By looking at it in person.
24 Q. Okay. And if you could, tell me what is the
25 difference between looking at the photos in front

Page 23

1  of you and being in person that would assist you
2  in making that type of determination?
3  A. Photos sometimes aren't really descriptive.
4  Q. Okay. Well, you've been in that area in
5  person in the past, correct?
6  A. Yes.
7  Q. And the area is within the North Little Rock
8  yard, correct?
9  A. That's correct.
10 Q. So would you agree with me that that should
11 be Class 2 ballast?
12 A. Say that again, please.
13 Q. Well, the area that we're looking at is
14 within the North Little Rock yard, correct?
15 A. Yes, sir.
16 Q. And based upon what we've talked about, that
17 should be Class 2 ballast, should it not,
18 according to Union Pacific's Railroad Ballast
19 Gradation Table?
20 A. Yes.
21 Q. Does that appear to be -- in those
22 photographs in Exhibit No. 6, does that appear to
23 be Grade 2 ballast?
24 A. Appears to be, yes.
25 Q. Do you recall ever having -- in your five

Page 24

1  years in North Little Rock, do you recall ever
2  having to order ballast for this general area
3  near the service track?
4  A. Yes.
5  Q. Do you recall what grade of ballast you
6  ordered?
7  A. Yard ballast.
8  Q. So that would be Class 2?
9  A. Yes.
10 Q. Now, when you order ballast, do you say Class
11 1, Class 2, or do you order it by referring to it
12 as mainline versus yard?
13 A. Well, it used to be Class C ballast.
14 Q. Okay. But how would you go about ordering it
15 in the current time frame?
16 A. Ask for Class 2 ballast.
17 Q. And when you ordered ballast for this
18 particular area near the service track, do you
19 recall if you ordered Class 2 or C?
20 A. I think it was Class C.
21 Q. Now, looking at Exhibit No. 6, I believe you
22 describe Class 2 ballast is varying in size from
23 an inch-and-a-half down to three-quarters of an
24 inch, correct?
25 A. Yes.

Page 25

1  Q. In looking at Exhibit No. 6, can you see any
2  pictures that -- or any rocks that appear to be
3  larger than an inch-and-a-half?
4  A. I can't compare to the rocks that are -- I
5  really can't compare them.
6  Q. Okay. And for my next question, if you
7  would, just assume for argument sake, that there
8  were a rock larger than a one-and-a-half, are you
9  aware of any type of percent of rocks that are
10 allowed in Class 2 ballast that are larger than
11 an inch-and-a-half that are still conforming to
12 Class 2 ballast?
13 A. No, sir. No.
14 Q. If there were rocks larger than an
15 inch-and-a-half in this area, could you possibly
16 tell me where those rocks came from?
17 A. No, I really couldn't.
18 Q. You could look at Exhibit No. 7, and I'll
19 tell you that these are purported to be rocks on
20 the location we just looked at in Exhibit No. 6.
21 The first rock I'm looking at only has a ruler on
22 one side of it. Do you see that particular rock?
23 All the other pictures have two rulers?
24 A. Yes, I see it.
25 Q. Okay. And can you -- by looking at this

Page 26

1  picture, that appears to be a rock that's
2  approximately six inches wide; would you agree
3  with me?
4  A. Approximately.
5  Q. Okay. Would this particular rock conform
6  with Class 2 ballast?
7  A. No.
8  Q. The second picture I'm looking at appears to
9  be kind of arrowhead looking. You have a white
10 ruler on the right and a yellow ruler on the
11 bottom. Are you there with me?
12 A. Yes, I suppose so.
13 Q. Well, let me clarify this. This one appears
14 to be -- and you can tell me if I'm wrong -- a
15 little under five inches on the white ruler and
16 approximately four-and-a-half on the yellow, if
17 you account for the fact that it's not lined up
18 to the bottom of each ruler. Do you see that?
19 Are we looking at the same one?
20 A. I have no idea.
21 Q. Well, let me ask you this question; why don't
22 you look through Exhibit No. 7 and take a look at
23 the measurements and the size of the rocks
24 depicted. Just take a moment and flip through,
25 and tell me when you've done that.

Page 27

1  A. Okay. I've done that.
2  Q. Okay. Would any of the rocks depicted
3  conform to Class 2 ballast?
4  A. No.
5  Q. Is there any type of program or any type of
6  inspection that goes on in the North Little Rock
7  yard whereby track maintenance personnel go
8  through walkway areas and see if they can find
9  any nonconforming rocks that are not Type -- or
10 Class 2 ballast and dispose of them?
11 A. No.
12 Q. Other than asking people that walk in that
13 area, which would be, you know, car men, firemen
14 and oilers, is there anyone that goes through
15 that area to determine if there's any
16 nonconforming ballast in the area to discard of
17 it?
18 A. Not to my knowledge.
19 Q. Do you know if there's ever been any
20 complaints about nonconforming ballast in the
21 walkway areas in the North Little Rock yard?
22 A. I don't know of any.
23 Q. Have you yourself ever seen any nonconforming
24 rocks, such as the ones depicted in Exhibit No.
25 7, in the walkways at the North Little Rock yard?

Page 28

1  A. No.
2  Q. Is there any type of routine maintenance done
3  on the ballast in the North Little Rock yard,
4  such as burning ballast regulators down the
5  various tracks?
6  A. Yes.
7  Q. And now, when I say on a routine basis, other
8  than when construction work is done on a track,
9  is a ballast regulator ever used in the North
10 Little Rock yard?
11 A. Yes.
12 Q. Okay. What is the system you have in place
13 for doing that?
14 A. I don't understand the question.
15 Q. Well, when I say routine maintenance,
16 generally, you know, it means once a month, once
17 a year, there's some type of system in place to
18 do routine maintenance. Do you have that type of
19 a system?
20 A. Yes.
21 Q. And how does the system work?
22 A. I still don't understand what you're asking.
23 Q. Well, does the ballast regulator run down a
24 track once a year on a regular basis, does it run
25 down the track once every six months, once every

Page 29

1  two years; what system do you have in place?
2  A. Whenever the track needs maintaining, that's
3  when it's used.
4  Q. Okay. So it's not so much of a routine
5  regular type of maintenance, it's whenever it's
6  requested?
7  A. That's correct.
8  Q. Okay. And do you recall any requests for
9  people or the managers have asked you to run the
10 ballast regulator down tracks in the North Little
11 Rock yard?
12 A. No.
13 Q. So while it's available, it's never been
14 done; would that be a fair statement?
15 A. No.
16     MR. TUCKER: Object to the form of
17 the question, but he can answer. He's already
18 answered it.
19 Q. Well, when you say no, it's never been done
20 or -- correct, or are you saying that's a
21 misstatement?
22 A. That's a misstatement.
23 Q. Okay. When has the ballast regulator been
24 run down the service track in the North Little
25 Rock yard, if you can tell me if that's been

Page 30

1  done?
2  A. Sometime in December.
3  Q. Of this year?
4  A. Of 2008.
5  Q. 2008, correct. I'm sorry. I misspoke
6  myself. Prior to December of 2008, do you
7  remember when it was done prior to that?
8  A. I don't have a specific date, no.
9  Q. And do you know why in December of 2008 there
10 was a ballast regulator run down the service
11 track?
12 A. We rebuilt a bunch of these tracks and laid
13 some switches.
14 Q. Do you know why Class 2 ballast is used in
15 the yard and in the walkways as opposed to using
16 Class 1?
17 A. No.
18 Q. Have you ever had any conversations with
19 anyone in Omaha in that regard?
20 A. No, sir.
21 Q. Have you ever been given or provided any
22 training or information regarding the differences
23 in the classes of ballast?
24 A. No.
25 Q. Now, your duties as Manager of Track

Page 31

1  Maintenance, would that also include
2  responsibility in regard to any obstructions that
3  may occur in the walkways between tracks in the
4  North Little Rock yard?
5       MR. TUCKER: Object to the form.
6  The witness can answer it.
7  A. Yes.
8  Q. If someone discovers tie butts or scrap or
9  dumping in the walkways that need removing, would
10 that be something that your department may have
11 to take care of?
12 A. Yes.
13 Q. And you would agree with me that removing
14 tripping hazards is important for the safe
15 operation of the railroad, correct?
16 A. Yes.
17 Q. And it's one of your responsibilities to make
18 sure there are no tripping hazards in those
19 areas, correct?
20 A. Yes.
21 Q. Do you recall any time in the last five years
22 in the North Little Rock area that your
23 department has been called upon or asked to
24 remove foreign objects in the walkways between
25 any of the tracks in North Little Rock?

Page 32

1  A. Yes.
2  Q. And what type of obstructions were those?
3  A. Tie plates, ties, car doors, wheels.
4  Q. And your department did so?
5  A. Yes.
6  Q. Do you know if any of those obstructions were
7  tripping hazards?
8  A. Yes, they were.
9  Q. Now, you were identified as a potential
10 witness regarding the case of Mr. Davis; were you
11 aware of that?
12 A. For this deposition?
13 Q. For deposition for information regarding this
14 case?
15 A. Yeah.
16 Q. Were you aware of that fact?
17 A. Yes.
18 Q. Do you know anything about how Mr. Davis
19 claims he was injured?
20      MR. TUCKER: Other than what I told
21 him?
22      MR. WILLIAMS: Correct.
23 Q. Other than what you were told by attorneys
24 for Union Pacific, do you have any independent
25 knowledge as to how Mr. Davis claims he was

Page 33

1  injured?
2  A. No, I do not.
3  Q. And I believe you said -- and just so I'm
4  clear -- you have done no investigation into his
5  particular incident and how it occurred; is that
6  correct?
7  A. I have not, that's correct.
8  Q. Do you know the date that Mr. Davis was
9  claiming he was injured?
10 A. No, sir, I do not.
11 Q. Around about the time of February 13th, 2007,
12 do you know if there was any maintenance work or
13 any type of construction or reconstruction work
14 near the service track in the North Little Rock
15 yard?
16 A. I know there was some work done, but I don't
17 know the dates.
18 Q. Now, you said that there was a ballast
19 regulator run down the service track in December
20 of 2008. Do you recall the last time any work
21 was done -- and you said you knew there was --
22 was it a year ago, was it in December of 2008
23 when the actual work was done to the service
24 track?
25 A. That's when the major reconstruction or major

Page 34

1  work was done in December '08.
2  Q. Are you aware of any work being done prior to
3  December of 2008 that you can recall a rough time
4  frame?
5  A. I recall work being done, but I don't know
6  the time frame.
7  Q. Do you know if it was in the year 2008?
8  A. I don't think so.
9  Q. Do you remember if it was in 2007?
10 A. There was some switch components -- switch
11 done in 2007.
12 Q. Now, when you say switch components in 2007,
13 could you please describe to me what you mean --
14 what exact work was being done, if you can
15 recall?
16 A. Putting in switch points and stop rails.
17 Q. And then was there any type of work done to
18 the ballast area around those switches when the
19 components were changed out?
20 A. No.
21 Q. When those switch components are changed,
22 does it involve any type of excavation or
23 digging?
24 A. No.
25 Q. Do you know whether or not the ballast

Page 35

1  gradation used by Union Pacific is used in
2  similar fashion by other railroads?
3  A. I don't know.
4  Q. Have you ever had any conversations with any
5  roadmasters or similar type of employees on other
6  railroads?
7  A. I don't understand your question.
8  Q. In other words, have you ever met or talked
9  to a roadmaster from BN or CFX or IC or --
10 A. Yes, I have.
11 Q. Have you ever talked to anybody at all in
12 regards to ballast or size of ballast?
13 A. No, I have not.
14 Q. I think that's all I have.
15         MR. TUCKER: We'll reserve ours.
16 Thank you, Mr. Cutrer.
17         (Deposition proceedings
18         concluded at 2:40 p.m.)

Page 36

1  I, CHARLES CUTRER, have read the foregoing
2  deposition and hereby affix my signature that
3  same is true and correct, except as noted herein.
4      CORRECTIONS AND/OR CHANGES AND SIGNATURE
5  PAGE   LINE     CORRECTION   REASON FOR CHANGE

18         CHARLES CUTRER

20 STATE OF ARKANSAS )
   COUNTY OF         )
21    SUBSCRIBED AND SWORN to before me by the said
   CHARLES CUTRER, on this the      day of
22            , A.D., 2009.

           Notary Public in and for
25         the State of Arkansas
           My Commission Expires:

Page 37

1           CERTIFICATE
2  STATE OF ARKANSAS )
                    ) ss:
3  COUNTY OF PULASKI )
4     I, KELLY HILL, Certified Court Reporter, a
   notary public in and for the aforesaid county and
5  state, do hereby certify that the witness,
   CHARLES CUTRER, was duly sworn by me prior to the
6  taking of testimony as to the truth of the
   matters attested to and contained therein; that
7  the testimony of said witness was taken by me
   stenographically, and was thereafter reduced to
8  typewritten form by me or under my direction and
   supervision; that the foregoing transcript is a
9  true and accurate record of the testimony given
   to the best of my understanding and ability.
10    I FURTHER CERTIFY that I am neither counsel
   for, related to, nor employed by any of the
11 parties to the action in which this proceeding
   was taken; and, further, that I am not a relative
12 or employee of any attorney or counsel employed
   by the parties hereto, nor financially
13 interested, or otherwise, in the outcome of this
   action; and that I have no contract with the
14 parties, attorneys, or persons with an interest
   in the action that affects or has a substantial
15 tendency to affect impartiality, that requires me
   to relinquish control of an original deposition
16 transcript or copies of the transcript before it
   is certified and delivered to the custodial
17 attorney, or that requires me to provide any
   service not made available to all parties to the
18 action.

21         Kelly D. Hill
           Certified Court Reporter
22         State of Arkansas
           Certification #515