**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**ROBERT DAVIS**                                                                                    **PLAINTIFF**

vs.                                          NO.:  4-07-CV-00521-BSM

**UNION PACIFIC RAILROAD COMPANY**                                         **DEFENDANT**

**REPLY BRIEF IN SUPPORT OF UNION PACIFIC'S
MOTION FOR SUMMARY JUDGMENT**

In his response, Plaintiff makes two main arguments against Union Pacific's Motion for Summary Judgment.  First, he contends that the recent amendment to the Federal Railway Safety Act ("FRSA") overruled the numerous preemption and preclusion decisions based on 49 U.S.C. § 20106.  Second, Plaintiff argues that the Federal Railroad Administration's ("FRA") ballast regulation does not subsume the field.  Plaintiff has misinterpreted the FRSA amendment and has relied on unpersuasive case law.  Therefore, for the reasons stated in Union Pacific's original brief and those herein, Union Pacific's Motion for Summary Judgment should be granted.

Before addressing Plaintiff's main arguments, it is important to clarify an issue Plaintiff raises under section C.4. of his brief.  Therein, Plaintiff states that his claim is not based solely on the size of ballast in Union Pacific's yard, but that he has also alleged "that defendant was negligent for failing to provide a safe place to work, for failing to provide reasonably safe conditions for work, failing to provide reasonably safe walking areas and failing to inspect and maintain its ballast."  All of these allegations, however, steam from the only specific claim Plaintiff has made:  that the ballast is too big.  *See* Exhibit A (Plaintiff's Answer to Interrogatory No. 14) (attached to Union Pacific's Brief, Docket No. 43), Exhibit B (Plaintiff's injury report) (attached to Union Pacific's Brief, Docket No. 43), and Exhibit C at 173-77 (Plaintiff's Deposition) (attached to Union Pacific's Brief, Docket No. 43).  Therefore, since Plaintiff's

1

ballast claim is precluded, Union Pacific is entitled to summary judgment on all of Plaintiff's allegations.

**I.      Recent amendments to the FRSA do not change the analysis of preemption or preclusion defenses.**

Plaintiff contends that the recent amendment to the FRSA overrules the decisions based on preemption and preclusion under 49 U.S.C. § 20106. Plaintiff is wrong. Congress amended the FRSA in response to federal court rulings in the Minot, North Dakota derailment litigation. This 2002 derailment released a cloud of anhydrous ammonia into the air, resulting in hundreds of alleged personal injuries and property damage. *See Mehl v. Canadian Pac.*, 417 F. Supp.2d 1104, 1106 (D. N.D. 2006). The National Transportation Safety Board later ruled that inadequate track maintenance and inspections were to blame, though the railroad disputed these findings. *See Lundeen v. Canadian Pac. Ry.*, 507 F. Supp.2d 1006 (D. Minn. 2007). The resulting litigation raised an issue not addressed in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993) or *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344 (2000)[1]: whether a claim premised on the violation of the federal standard survived preemption.

A group of plaintiffs (*Mehl* plaintiffs) sued in federal district court in North Dakota. They argued that the railroad had failed to comply with federal safety regulations governing continuous-welded-rail track and that this noncompliance defeated federal preemption. *Mehl*, 417 F. Supp.2d at 1116. The federal district court disagreed and dismissed the plaintiffs' actions.

Another group of plaintiffs (*Lundeen* plaintiffs) sued in Minnesota state court. They argued that the railroad failed to comply with its own internal procedures created pursuant to

---

[1] *Easterwood* and *Shanklin* are discussed in Union Pacific's Brief in Support of its Motion for Summary Judgment. *See* Docket No. 43 at 2-3.

federal regulations for repairing continuous-welded-rail track.  *See Lundeen,* 507 F. Supp.2d at 1011.  The state court found that the claim was not preempted because plaintiffs alleged that the "Defendants did not comply with the regulations in the first place."  *See In re Soo Line RR. Co. Derailment of January 18, 2002*, No. MC 04-007726, Opinion at p. 14, 2005 WL 4926932 (Minn. Dist. Ct. Dec. 19, 2005) (order on preemption issues); *see also In re Soo Line RR. Co. Derailment of January 18, 2002*, No. MC 04-007726, 2006 WL 1153359 (Minn. Dist. Ct. Apr. 24, 2006) (supplemental order).

The *Lundeen* cases were later removed to federal court under a theory of complete preemption, and the federal court reached a different conclusion.  *Lundeen,* 507 F. Supp.2d at 1010-12.  Following *Mehl*, the federal court ruled that the railroad's noncompliance with the federal standard was not relevant to the preemption analysis and dismissed the plaintiff's case.  *Id*.

Both federal courts suggested a legislative fix.  The *Mehl* court recognized that "it is the province of Congress, not the judicial branch," to provide a private remedy when federal standards of care have been violated.  *Mehl*, 417 F. Supp. 2d at 1120-21.  The *Lundeen* federal court similarly said:  "This is the regulatory scheme which Congress has imposed.  And when Congress has spoken, any relief from its regime must come from Congress rather than the Courts."  *Lundeen*, 507 F. Supp.2d at 10106.  Several months later, Congress took up this invitation and clarified the statute's reach.

      **a.**     **Section 1528 of the 9/11 Act**

On August 3, 2007, President Bush signed the 9/11 Act into law.  Section 1528 amends the federal preemption provision in 49 U.S.C. § 20106.  *See* Exhibit 1.  It has two subsections.  Subsection (a) restates the existing federal preemption rule and subsection (b) clarifies it.

In subsection (a), Congress restates the text of 49 U.S.C. § 20106 as it existed prior to amendment. H.R. Rep. No. 110-259, at 351 (Exhibit 2). Thus, Congress left intact the "covering the subject matter" language interpreted in *Easterwood* and *Shanklin*. The Conference Report – the only legislative report that accompanied the language enacted by Congress – confirms that Congress did not effect a substantive change. "It is restructured for clarification purposes; however, the restructuring is not intended to indicate any substantive change in the meaning of the provision." *Id.*

Subsection (b), entitled "Clarification Regarding State Law Causes of Action," addresses the Minot rulings. Its purpose is to "rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent." H.R. Rep. No. 110-259, at 351. To accomplish this, subsection (b) clarifies "what State law causes of action for personal injury, death or property damages are not preempted." *Id.* It provides:

> **(b) Clarification Regarding State Causes of Action** – (1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party –
>
> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;
>
> (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
>
> (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

49 U.S.C. § 20106(b), as amended (Exhibit 3).

The subparts match the contentious issues in the Minot derailment litigation. Subpart (A) overrules the *Mehl* court's ruling that a cause of action based on a railroad's non-compliance with a federal regulation is preempted. Subpart (B) overrules the *Lundeen* court's ruling that non-compliance with a railroad's rule created pursuant to a regulation is preempted. Subpart (C) reinstates existing law. *See Easterwood*, 507 U.S. at 662; *Shanklin*, 529 U.S. at 348. It completes the universe by capturing any claim not preempted by the operative language of Subsection (a). *See Van Buren v. Burlington N. Santa Fe Ry. Co.*, 544 F. Supp.2d 867, 876 (D. Neb. 2008) (discussing the 2007 amendment to the FRSA); *Murrell v. Union Pacific R.R. Co.*, 544 F. Supp.2d 1138, 1147-48 (D. Or. 2008).

In the process of considering a fix for the Minot derailment, House Representative Bennie Thompson proposed a provision that would have largely eliminated preemption of state tort actions. The House passed this provision. However, it was vigorously opposed by the Administration, which threatened a veto, and it was never passed by the Senate. Thus, the only enacted legislation is the clarification made by Section 1528 of the 9/11 Act.

        b.      **Section 1528 does not overrule *Easterwood* and *Shanklin*.**

Section 1528 does not set aside the thirty-five years of precedent interpreting the FRSA's preemption/preclusion scheme or overrule *Easterwood* or *Shanklin*. Where the railroad meets or exceeds the federal standards of care that apply to its conduct, the passage of Section 1528 changes nothing. *See, e.g.*, *Henning v. Union Pacific R.R.*, 530 F.3d 1206, 1214-16 (10th Cir. 2008) ("Congress did not overrule *Shanklin*"); *Southern California Regional Rail Authority v. Superior Ct.*, 163 Cal. App. 4th 712, 738 (Calif. App. 2008) ("there is no indication that Congress intended such a change"); *Van Buren*, 544 F. Supp. 2d at 875-76; *Murrell*, 544 F. Supp. 2d at 1148; *Mastrocola v. Southeastern Penn. Transp.*, 941 A.2d 81, 90 n.12 (Pa. 2008).

Section 1528, on its face, indicates Congress' intent to clarify preemption/preclusion but not effect a substantive change. *Smith v. Burlington N. Santa Fe Ry. Co.*, 344 Mont. 278 at ¶ 24 (Mont. 2008) ("the plain language of Section 1528 supports BNSF's construction of the statute."). Congress formally declared that the amendment is a "Clarification Regarding State Law Causes of Action." Section 1528(b)(1) (Exhibit 1).

In interpreting Section 1528, courts have recognized that the "clarification" label is strong evidence of congressional intent not to effect a substantive change in the law of FRSA preemption/preclusion. *See Henning*, 530 F.3d at 1216; *Smith*, 344 Mont. 278 at ¶ 22. A clarifying amendment, by definition, resolves an ambiguity without effecting a substantive change. *See Henning,* 530 F.3d at 1216 (citing *Brown v. Thompson*, 374 F.3d 253, 259 & n.2 (4th Cir. 2004) ("Congress passed a subsequent amendment to clarify rather than change existing law."))[2]. Typically, a clarification enactment "follows fast upon the ambiguity's discovery," *Liquilux Gas Corp. v. Martin Gas Sales,* 979 F.2d 887, 890 (1st Cir. 1992), such as when one court splits from the other courts or issues what Congress believes to be an aberrational ruling. *ABKO Music, Inc. v. La Vere*, 217 F.3d 684, 690-91 (9th Cir. 2001)[3]. The purpose of a clarifying amendment is to remove the cloud of ambiguity and bring the law back into conformity with preexisting precedent. *See id.*; *see also Brown*, 374 F.3d at 259 & n.2.

As the courts have further recognized, the statutory structure confirms that Congress intended to fix the Minot rulings without effecting a substantive change in existing law. *Van*

---

[2] *See also Motorola, Inc. v. Fed. Express Corp.*, 308 F.3d 995, 1007 (9th Cir. 2002) (clarifying amendment does not create a substantive change); *In re M&L Bus. Mach. Co.,* 75 F.3d 586, 590 & n.6 (10th Cir. 1996); 2B N. Singer, Statutes and Statutory Construction § 49:11, at 126 (6th ed. 2000).

[3] *See also Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1265-66 (9th Cir. 1997); *Brown*, 374 F.3d at 259 n.2 ("courts regularly view a conflict in the courts with regard to the proper interpretation of a statute-as an indication that Congress passed a subsequent amendment to clarify rather than change existing law."); *NCNB Texas Nat'l Bank v. Cowden*, 895 F.2d 1488, 1501 (5th Cir. 1990).

*Buren*, 544 F. Supp. 2d at 876; *Mastrocola*, 941 A.2d at 90 n.12. Congress retained the text of the prior version of the statute, setting forth the original 1970 preemption/preclusion test, and thereby embraced the Supreme Court's interpretation in *Shanklin* and *Easterwood*. *See Smith*, 344 Mont. 278 at ¶ 23 (citing *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988)). Congress added subsections (b) and (c) to remedy the rulings from the Minot derailment federal district court cases. *See Smith*, 344 Mont. 278 at ¶ 23.[4] Thus, "Congress did not overrule *Shanklin*, but instead provided clarification for courts interpreting *Shanklin*, establishing FRSA preemption does not apply when a railroad violates a federal standard of care." *Henning*, 530 F.3d at 1216.

Numerous courts have found that this interpretation is supported by the legislative history of the clarifying amendment. "The Conference Report to 1528 explicitly states that it is enacted to remedy the rulings from the Minot derailment federal district court cases, and makes no mention of *Shanklin*." *Smith*, 344 Mont. 278 at ¶ 23. The Conference Report states that "the restructuring is not intended to indicate any substantive change in the meaning of the provision." H.R. Rep. No. 110-259, at 351; *see also Southern California Regional Authority*, 163 Cal. App. 4th at 737 ("the legislative history . . . reveals Congress did not intend any substantive change in the meaning of . . . section 20106"). "Congress explicitly explained it sought to rectify the Minot, North Dakota cases 'that are in conflict with precedent.'" *Henning*, 530 F.3d at 1216 (quoting H.R. Rep. No. 110-259, at 351).

In short, Congress identified the problem with the Minot cases, rectified it, and reaffirmed the remainder of the FRSA preemption/preclusion statute along with the body of law

---

[4] In subsection (b), Congress included a retroactivity provision to clarify that the amendment applies to causes of actions arising from events on or after January 18, 2002 – the date of the Minot derailment. *See* Section 1528(b)(2) (Exhibit 1).

giving shape to that language. Section 1528's clarification does not impact the *Shanklin* and *Easterwood* decisions.

### c. If Congress intended to overrule prevailing law, it would have made its intention clear.

In rejecting arguments regarding the Clarifying Amendments, courts have observed that Congress did not signal any intention to overrule Supreme Court precedent. "Had Congress sought to overrule *Shanklin* and *Easterwood*, it would have done so in express terms." *Henning*, 530 F.3d at 1216. It is established that "if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *MidAtlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986).[5] By way of comparison, Congress has on other occasions made express its intent to overrule Supreme Court precedent.[6]

There is no manifestation here whatsoever – let alone a clear one – that Congress intended to overrule *Easterwood* or *Shanklin*. *See Smith*, 344 Mont. 278 at ¶ 23; *Murrell*, 544 F. Supp. 2d at 1148 ("the clarification to section 20106 did not explicitly overrule the decisions in *Shanklin* and *Easterwood*"). The *only* federal decisions mentioned in the legislative history are the Minot federal court decisions, which Congress said were in "conflict with precedent." H.R. Rep. 110-259, at 351. In that light, Section 1528's text and legislative history, far from showing a clear intention to reject the Supreme Court's opinions, in fact demonstrates an intention to preserve them.

---

[5] *Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 52 (2004) (Congress "likely would have flagged that substantial change" but did not); *Sale v. Haitian Ctrs. Council, Inc*, 509 U.S. 155, 176 (1993) ("[i]t would have been extraordinary for Congress to make such an important change in the law without any mention of that possible effect"); *Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 17-18 (1987) ("common sense suggests, by analogy to Sir Arthur Conan Doyle's 'dog that didn't bark,' that an amendment having the effect petitioner ascribes to it would have been differently described by its sponsor"); *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 380 (1988) ("most improbable" that "[s]uch a major change in the existing rules . . . would have been made without even any mention in the legislative history.").

[6] *See* William N. Eskridge, *Overriding Supreme Court Statutory Interpretation Decisions*, 101 Yale L.J. 331, Appendix I (1991) (collecting examples).

### d. The enactment history confirms that Congress did not intend to make a radical change in FRSA preemption/preclusion.

After the Minot decisions, Congressman Bennie Thompson proposed an amendment that represented a radical break from the FRSA's original preemption/preclusion statute. It provided: "No Preemption of State Law – Nothing in section 20106 of title 49, U.S. Code, preempts a State cause of action . . . unless compliance with State law would make compliance with Federal requirements impossible." H.R. Rep. 110-73, § 3 (Exhibit 4). Thompson also would have amended 49 U.S.C. § 20106 to preempt only executive orders or legislative enactments, and not common law claims. *See id.* The Thompson amendment was added to a House Bill (H.R. 1401), without committee consideration and with only four hours before the House voted on the entire bill.

The Thompson amendment then provoked a storm of concern. In a letter to the House Speaker, the Administration said that that it "strongly oppose[d]" this amendment and threatened a presidential veto. *See* May 30, 2007 Letter from Secretary of Homeland Security to House Speaker Nancy Pelosi (Exhibit 5). The Administration complained that the amendment "was added without any hearings or debate" and yet "would overturn many years of Supreme Court decisions for no valid reason and spawn a great deal of needless litigation." *Id.* at 5. The Administration expressed concerns about the adverse impacts: "Even more importantly, [the Thompson Amendment] would balkanize railroad safety and security and could lead to an increase in wrecks, deaths, and injuries on the Nation's railroads." *Id.* Ultimately, the Senate did not accept the Thompson Amendment, and it was not enacted into law.

The differences between the failed Thompson Amendment and the approved legislation are striking. For example, the Thompson Amendment is entitled "No Preemption of State Law," whereas the approved legislation is entitled "Preemption." The Thompson Amendment

9

preempts/precludes only "positive laws, regulations, or orders," while the approved legislation continues to preempt/preclude all forms of state regulation. The Thompson Amendment used a conflict preemption/preclusion test, while the approved legislation embraces the field preemption/preclusion test of the earlier statute ("covering the subject matter"). Finally, unlike the Thompson Amendment, the approved legislation deliberately restates the fundamental principle of national uniformity in rail regulation and federal preemption/preclusion. *See* H.R. Rep. No. 110-259, at 351 (restating provision for "National Uniformity of Regulation") (Exhibit 2).

"Congress sometimes can speak as clearly by opting not to enact proffered language as by enacting it." *Massachusetts Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176, 185 (1st Cir. 1999). To read language into a statute that Congress has considered and rejected, "is not a construction of [the] statute, but, in effect an enlargement of it by the court." *Iselin v. United States*, 270 U.S. 245, 251 (1926). "Congress 'does not intend *sub silento* to enact statutory language that it has earlier disregarded in favor of other language.'" *Smith*, 344 Mont. 278 at ¶ 23 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987)).[7]

In short, Section 1528 did not overrule *Shanklin* and *Easterwood*. Every available piece of evidence confirms that Congress did not make a fundamental change in its clarifying amendment to 49 U.S.C. § 20106. The FRSA did, and still does, mandate federally uniform regulations for rail safety and security.

---

[7] *See also Hamdan v. Rumsfeld,* 126 S. Ct. 2769, 1766 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."); *Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001) (courts "ordinarily will not assume that Congress intended to enact statutory language that it has earlier discarded in favor of other language") (quotations omitted); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 199-200 (1974) (Committee's action "strongly militates against a judgment that Congress intended a result that it expressly declined to enact").

  e.  **The new provisions in 49 U.S.C. § 20106 do not apply.**

  The 2007 Clarifying Amendment to 49 U.S.C. § 20106 does not affect the preclusion defense in this case. Subsection (a) is the operative portion of the statute. It restates the operative rule under existing law. Subsection (b) is a clarification to Subsection (a). It clarifies what is NOT preempted by this section. *See Van Buren*, 544 F. Supp. 2d at 876. The first two subparts of subsection (b) identify certain types of claims that arose in the Minot litigation. In order to complete the universe, subpart (C) captures all of the remaining claims that are not preempted/precluded by ("not incompatible with") the operative language of Subsection (a).

  Plaintiff contends that since Union Pacific has a set of recommendations for ballast that preclusion cannot apply here because this case falls within the new exception found in 49 U.S.C. § 20106(b)(1)(B). Plaintiff has again misapplied the law. Section 20106(b)(1)(B) clarifies there is no preemption/preclusion in certain circumstances when the railroad fails to comply with its own plan, rule or standard. This exception does not apply to just any railroad plan, rule or standard, however. The key limitation is that the railroad's "plan, rule or standard" must have been "*created pursuant to* a regulation or order issued by either of the Secretaries." 49 U.S.C. § 20106(b)(1)(B) (emphasis added).

  This provision overrules the federal court's decision in *Lundeen*. In *Lundeen*, the court found that the railroad's internal rules established a federal standard of care because they were required by federal regulations and reviewed by the federal agency. *Lundeen*, 507 F.Supp.2d at 1011. The regulation at issue in *Lundeen* states: "Each track owner with track constructed of CWR shall have in effect and comply with a plan that contains written procedures." 49 C.F.R. § 213.119 (2006). FRA "review[s] each railroad's plan to ensure it addresses certain safety issues and monitors compliance with the procedures." *Lundeen*, 507 F.Supp.2d at 1011 (citing 49 C.F.R. § 213.119). Thus, the internal rules operate as a proxy for the FRA's own regulations and

11

establish a federal standard of care. *See Henning*, 530 F.3d at 1215. The *Lundeen* court found this standard preemptive, even when the plaintiff's alleged that the railroad failed to comply with it. *Id*. Congress reversed that ruling, finding that a railroad could not invoke preemption where it had failed to follow the federal standard as embodied in the railroad's approved rules.

In light of both the language of § 20106(b)(1)(B) and its history, courts have held that the federal regulation must place an affirmative duty on the railroad to create the governing safety standard. For example, in *Murrell v. Union Pacific R.R. Co*., 544 F. Supp. 2d 1138 (D. Or. 2008) the plaintiff argued that preemption was inapplicable under the 2007 Clarifying Amendment because the railroad failed to comply with designated speed limits set in its timetables and train orders. *Id*. at 1150. The court rejected this argument because the railroad's "maximum timetable speed limits were internal rules that were not 'created pursuant to a [federal regulation] or order issued by the Secretaries.'" *Id*. (quoting § 20106(b)(1)(B)). The court reasoned that the railroad's internal rule, for which FRA approval is not required, does not embody any federal standard. *Murrell*, 544 F.Supp.2d at 1150-51. "Federal regulations, which specify speed limits for different types of tracks and trains, are not affected by internal railroad policies." *Id*. (citing, *e.g*., *St. Louis Southwestern Ry. v. Pierce*, 68 F.3d 276, 278 (8th Cir. 1995)). If a railroad fails to comply with such an internal rule on speed, but does not exceed the speed limit specified in the federal regulations, any claim remains preempted under *Easterwood*, 507 U.S. 673-76. *See Murrell*, 544 F. Supp. 2d at 1150.[8]

The same conclusion has been reached by the federal district court in Nebraska with regard to a railroad's internal rules on the clearing of vegetation. *Van Buren v. Burlington*

---

[8] Numerous cases have held that state law claim of excess speed based on company time table limits are preempted. *E.g., Michael v. Norfolk Southern Ry. Co.*, 74 F.3d 271 (11th Cir. 1996); *St. Louis Southwestern Ry. v. Pierce*, 68 F.3d 276 (8th Cir. 1995).

*Northern*, 544 F. Supp. 2d at 879. Because those rules were not created pursuant to the requirements of any federal regulation, the court reasoned, they have no effect on preemption. *See id.*

Likewise, subsection (b)(1)(B) does not cover the alleged violations of the internal rules at issue here. The internal ballast guidelines cited by Plaintiff were not "created pursuant to" regulations or orders issued by the Secretary of Transportation. The internal guidelines were not required by the Secretary, and they do not embody a federal standard of care. Thus, the internal guidelines were not "created pursuant to a federal regulation," as required for this exception to preemption/preclusion.

      **f.**      **Congress left intact the FRSA's ability to preclude FELA claims.**

Plaintiff contends that the FRSA was not intended to preclude FELA claims. However, it is clear that Congress left intact the FRSA's preclusive effect on FELA claims. When enacting the recent amendment, Congress retained the prior preemption provision in its entirety, simply renumbering it as Subsection 20106(a). Consistent with the express declaration that the restructuring was "not intended to indicate any substantive change in the meaning of the provision" (H.R. Rep. No. 110-259 at 351, 2007 U.S.C.C.A.N. at 183), the renumbered provision continues to be entitled "National Uniformity of Regulation" and continues to provide that "[l]aws, regulations, and order related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1).

Congress' amendment to the FRSA in 2007 was well after courts across the country held that FRA regulations promulgated pursuant to the FRSA preclude FELA claims covering the same subject matter.[9] It is well established that "Congress is presumed to be aware of an

---

[9] *See, e.g., Dickerson v. Union Pac. R.R. Co.*, 428 F. Supp.2d 909, 913-14 (E.D. Ark. 2006) (noting that "courts have precluded FELA claims when the railroad's underlying conduct was in compliance with specific FRSA

13

administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). That principle applies equally "where, as here, Congress adopts a new law incorporating sections of a prior law." *Id.* at 581. Because Congress is "presumed to have had knowledge of the interpretation given to the incorporated law," (*Id.*) the fact that the amended FRSA "left intact the statutory provisions under which federal courts have implied" preclusion of FELA claims "is itself evidence that Congress affirmatively intended to preserve" that result. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381-82 (1982).

The conclusion that Congress intended to leave *Waymire, Lane, Dickerson,*[10] and the many other FELA preclusion decisions undisturbed when it amended section 20106 is reinforced by the history and text of the subsections added by the amendment. This amendment was indeed designed to rectify certain judicial decisions, but—as explained in the Conference Report—specifically those "related to the Minot, North Dakota accident." H.R. Rep. 110-259 at 351, 2007 U.S.C.C.A.N. at 183. This limited purpose is clearly reflected in the amendment's retroactive effective date of January 18, 2002, which is the "date of the Minot" derailment. H.R. Rep. 110-259 at 351, 2007 U.S.C.C.A.N. at 183-84. The decisions that Congress sought to

---

regulations" and hold FELA claim challenging crashworthiness of locomotive precluded by FRSA); *Major v. CSC Transp.*, 278 F.Supp.2d 597, 608-10 (D. Md. 2003) ("the district courts are agreed that a FELA claim may be [precluded] by the FRSA."); *In re Amtrak "Sunset Limited" Train Crash*, 188 F. Supp.2d 1341, 1349 (S.D. Ala. 2000) ("Like common law negligence claims, FELA negligence claims may not be used to impose duties beyond those imposed by Congress or the FRA—that is, FELA claims may, indeed, be subject to [preclusion]."); *Norfolk S. Ry. Co. v. Denson*, 774 So.2d 549 (Ala. 2000) (FELA claim that railroad failed to provide air conditioned cab so as to prevent entry of fire was precluded by LIA); *Mitciotto v. Brown*, 2003 WL 22326559 (E.D. La. Oct. 6, 2003) (LIA precluded FELA claim based on failure to have seatbelt and safety padding on locomotive); *Thirkill v. J. B. Hunt Transport, Inc.*, 950 F.Supp. 1105 (N.D. Ala. 1996) (LIA precluded FELA grade crossing accident claim that independent brake valve was poorly located); *Sindoni v. Consolidated Rail Corp.*, 4 F.Supp.2d 358 (M.D. Pa. 1996) (FELA "crash-worthiness" claim [seatbelts, air bags, etc.] in crossing accident was precluded);[9] and *Lane v. Sims*, (S.D. Miss., No. 1:97 cv558GR, Aug. 16, 1999), *affirmed* 241 F.3d 439 (5th Cir. 2001) (FELA crossing accident claim for failure to provide armrests, hand-holds, and seatbelts in locomotive cab was precluded by the LIA).

[10] *Waymire, Lane,* and *Dickerson* are discussed in Union Pacific's Brief in Support of its Motion for Summary Judgment. *See* Docket No. 43 at 3-4.

14

rectify, *Lundeen* and *Mehl*, had concluded that the FRSA preempts state-law tort claims so long as an FRA regulation covers the subject matter even if the defendant railroad failed to comply with those regulations and the internal standards it was required to adopt pursuant to those regulations. It was in response to those decisions that Congress adopted section 20106(b)(1), which provides that claims are not preempted when the defendant "failed to comply with the Federal standard of care established by a regulation" or "failed to comply with its own plan, rule, or standard that it created pursuant to regulation." *Crabbe v. Consolidated Rail Corp.*, No. 06-12622, 2007 WL 3227584, at *1 (E.D. Mich. Nov. 1, 2007). Nothing in the history or text of the amended section 20106 suggests that Congress intended to abrogate *Waymire, Lane*, or any other decision in which courts have concluded that FRA regulations promulgated pursuant to the FRSA preclude FELA claims covering the same subject matter.

II. **The FRA Ballast Regulation Covers the Same Subject Matter as Plaintiff's FELA Claim.**

As an alternative to his argument that the amendment to the FRSA abolished preemption and preclusion, Plaintiff argues that his claim should not be dismissed because the FRA's ballast regulation does not subsume the field and because his "allegations are concerned with walkways and have nothing whatsoever to do with tracks or the provisions of §213.[1]03." *See* Plaintiff's Response at 12 (Docket No. 45). In support of his argument, Plaintiff cites to several cases that have ruled that the FRA's ballast regulation does not preclude claims regarding walkways. The rationale behind these decisions should be abandoned. The better reasoned decisions have determined that walkways next to tracks are part of the track structure and rail system and that claims and regulations regarding walkways are either preempted or precluded.[11]

---

[11] Plaintiff's photograph of the incident scene clearly shows that the area he deems a walkway is a part of the track structure.

15

For example, courts have held that claims involving trackside walkways undermine the national uniformity of Track Safety Standards. In *Norfolk & Western Ry. Co. v. Burns*, 587 F.Supp. 161 (E.D. Mich. 1984), the State of Michigan cited the railroad for having "large rocks" in the "walk area" between tracks in a rail yard and attempted to require trackside walkways. *Id*. at 163. The district court held that the state's citations were preempted by the FRA Track Safety Standards:

> Insofar as rails and track surface, including cross ties and ballast and all adjacent switches and appurtenances are concerned, this court has no trouble in concluding that the federal regulations do treat this subject comprehensively, and that there has been a clear indication of an attempt to regulate these areas in a manner which would preempt state regulation. . .
>
> . . . to the degree, for example, that the State would attempt to require some specific kind of surface on the walkways or would attempt to keep cross ties in place on the track from extending into walkways, or would attempt to tell the railroad what kind of ballast they must cover the exposed end of the railroad ties with, this would all be construed by this court to be within the area that is preempted. This would not only include an affirmative request of the State, for example, such as to blacktop the walkways, but would also preclude the State from complaining of generally poor surface conditions such as muddy walkway or a stony walkway.

*Id*. at 169-179.

In *Black v. Seaboard Sys. R.R.,* 487 N.E.2d 468 (Ind. App. 1986), the Indiana Court of Appeals held that an Indiana state requirement that a railroad construct walkways along tracks for its employees was preempted:

> Although unsafe walkways have not been the subject of specific federal regulations, the regulations as adopted indicate a congressional determination to regulate the entire railroad area. Walkways are a part of the track structure and rail system that in general present an area preempted by the Federal Railroad Administration, and they are immune from further regulation by state agencies.

*Id*. at 469 (citations omitted). *See also Norfolk & Western Ry. Co. v. Public Utilities Comm'n of Ohio*, 926 F.2d 567 (6th Cir. 1991) (holding that an Ohio state law requiring railroads to construct walkways on bridges was preempted); *Missouri Pac. R.R. Co. v. R.R. Comm'n of Texas*, 823 F.Supp. 1360 (W.D. Tex. 1990), *affirmed* 948 F.2d 179 (5th Cir. 1991) (holding that a Texas regulation requiring trackside walkways was preempted).

Not only have numerous courts determined that the FRA ballast regulation subsumes the field even when walkways are involved, it is clear that the Federal Railroad Administrator believes that walkways beside tracks in yards and along the railroad's right-of-way are covered by FRA regulations. In March 1978, the Administrator issued a "Policy Statement," in which he "address[ed] jurisdictional issues arising with respect to the operations of common carriers and the general system of rail transportation." 43 Fed. Reg. 10584, 10585. In the statement, the Administrator identified three areas of particular concern to the FRA: (1) track, roadbed, and associated devices and structures; (2) equipment; and (3) human factors. *Id*. The clear implication of the policy statement was that the FRA intended to exert its statutory authority to regulate these subject areas, including walkways. *See* 43 Fed. Reg. 10587 (Exhibit 5).

The FRA has exerted its authority over ballast as a part of "an integrated undertaking" regarding track structure. 43 Fed. Reg. at 10585. For example, subpart (d) of the ballast regulation requires that the ballast "[m]aintain proper track crosslevel, surface and alignment" (49 C.F.R. Part 213.103(d)), three technical characteristics for which highly detailed requirements are in turn set forth in 49 C.F.R. Part 213.57, 213.69, and 213.55. Similarly, the selection of ballast directly affects drainage and vegetation growth, which are themselves regulated by 49 C.F.R. Part 213.33 and 213.37. Given the intricate matrix of regulations of which the ballast regulation is one part, it is clear that a railroad cannot change the ballast it uses

without impacting on other related working conditions and without impacting on the safe transportation of persons and property. 43 Fed. Reg. at 10585. Indeed, it is precisely because ballast walkways "are so much a part of the operating environment" that the FRA believes that **"they must be regulated by the agency with primary responsibility for railroad safety."** *Id*. at 10,587 (emphasis added) (Exhibit 6).

In light of the dense regulatory structure regarding track structure, the better reasoned decisions have ruled that claims and regulations related to ballast size and walkways are preempted and precluded. Allowing ballast claims such as Plaintiff's to proceed will open a Pandora's box. If Union Pacific can be sued for having ballast that someone claims is too big, then there is nothing to prevent the next plaintiff from suing Union Pacific and claiming that the ballast is too small or challenging the material used to make the ballast or arguing the ballast should be smooth rather angular. If ballast claims are not precluded, there could be an unending stream of such cases, each subject to *ad hoc* adjudication and each contrary to Congress' goal of national uniformity in railroad regulation. Accordingly, the Court should find that Plaintiff's claims are precluded and that Union Pacific is entitled to summary judgment.

## CONCLUSION

For the reasons herein and in Union Pacific's opening brief, Union Pacific's Motion for Summary Judgment should be granted.

Respectfully submitted,

SCOTT H. TUCKER, #87176
KRISTOPHER B. KNOX, #2004071
FRIDAY, ELDREDGE & CLARK
400 W. Capitol Avenue, Suite 2000
Little Rock, Arkansas  72201
Telephone:  (501) 376-2011
Fax: (501) 376-2147
tucker@fec.net
kknox@fec.net

*Attorneys for Union Pacific Union Pacific Railroad Company*

/s/ Kristopher B. Knox
KRISTOPHER B. KNOX, #2004071

**CERTIFICATE OF SERVICE**

      I, Kristopher B. Knox, do hereby certify that on this 2d day of February, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

Nelson G. Wolff
Roger Denton
Andrew S. Williams
Julia M. Eades
Schlichter, Bogard & Denton
100 South 4th Street, Suite 900
St. Louis, MO  63102

Edward T. Oglesby
Oglesby Law Firm, P.A.
100 Morgan Keegan Drive, Suite 110
Little Rock, AR  72202

                /s/ Kristopher B. Knox
                KRISTOPHER B. KNOX, #2004071
                FRIDAY, ELDREDGE & CLARK
                400 W. Capitol Avenue, Suite 2000
                Little Rock, Arkansas  72201
                Telephone:  (501) 376-2011
                Fax: (501) 376-2147
                kknox@fec.net